Telia U. Williams, Esq.
Law Office of Telia U. Williams
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
Tel: (702) 835-6866
telia@telialaw.com
*Attorney for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| INJURYLOANS.COM, LLC, a Nevada entity; ADAM STOKES, an individual, <br><br> Plaintiffs, <br><br> vs. <br><br> SERGIO BUENROSTRO, an individual; CITIGROUP, INC. (dba "Citibank"), an entity. <br><br> Defendants. | Case No: <br><br><br><br><br> **COMPLAINT** <br> -**Jury Trial Demand** |

Plaintiffs InjuryLoans.com, LLC and Adam Stokes complain and allege as follows:

### I.      JURISDICTION, PARTIES, AND VENUE

*1.*   This action arises in part under the statutes of the United States for violations by defendant Sergio Buenrostro of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*

2.   This action also arises under Know Your Customer (KYC) regulations, specifically the Customer Identification Program (CIP), and Customer Due Diligence (CDD), and general negligence of a federally-insured bank, defendant Citigroup, Inc.

*3.*   As such, this court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this matter arises as a result of alleged violations of federal law.

*4.*   This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over plaintiffs' state

law claims as they form part of the same case or controversy.

5. Defendant Citigroup, Inc. ("Citibank" or "the bank") is a publically-traded company with regular operations in Clark County, Nevada.

6. At all relevant times, defendant Citibank's agents and employees were acting in the course and scope of their employment and/or agency.

7. Defendant Sergio Buenrostro ("Buenrostro") is an individual who resides in Clark County, Nevada.

8. Plaintiff Adam Stokes ("Stokes") is an individual who resides in Clark County, Nevada.

9. Plaintiff InjuryLoans.com, LLC ("Injury Loans" or the "company") is an entity that resides and regularly does business in Clark County, Nevada.

10. Plaintiffs may be aware of an individual defendant, and/or other entity, that has not yet been named, who may be liable; plaintiffs intend to amend this complaint once this individual and/or entity is known, if feasible and/or appropriate.

11. Venue is appropriate in this court under 28 U.S.C. § 1391, as the events complained of happened in Clark County, in the District of Nevada, and the defendants are subject to this court's personal jurisdiction.

## II.   FACTUAL ALLEGATIONS

12. Stokes is an attorney and business owner who owns and operates, among other things, Injury Loans.

13. Injury Loans finances plaintiffs in personal injury lawsuits in exchange for reimbursement plus interest from a part of their anticipated recovery at the resolution of their cases.

14. Stokes became acquainted with Buenrostro when the latter worked as a legal assistant to Stokes' ex-wife.  Buenrostro later assisted Stokes as an administrator in operation of Stokes' company.

15. Among Buenrostro's duties was to communicate with third parties, including the attorneys handling personal injury cases, and intermediaries, (including attorney brokers of the loans), and to assist in administering the paperwork, documentation, and pay-outs of the loans, under Stokes' supervision.

16. Stokes suffered a debilitating head and brain injury in 2017 that had him hospitalized and severely incapacitated for several months out of the jurisdiction.

17. Stokes effectively closed his company, leaving another attorney in charge of clearing and cleaning up any remaining business from his Injury Loans practice. (This attorney has nothing to do with the matters complained of herein).

18. While Stokes was thus incapacitated, Buenrostro "sold" loans belonging to Injury Loans to a third party, collecting a profit to which he was not entitled, but which belonged to Injury Loans and/or Stokes.

19. Buenrostro represented that he had authorization to collect monies on behalf of Stokes, which was not true, and then appropriated the funds to himself.

20. In the way of one example, Buenrostro took loans on which Injury Loans was owed literally hundreds of thousands of dollars, approximately a half million dollars, and "sold" them to attorney Brian Garelli, Esq., who operates a national injury loan practice, Preferred Capital, for less than their face value, and pocketed the proceeds, or most of the proceeds, without informing Stokes of the same.

21. To facilitate this fraud, Stokes has recently learned, Buenrostro unilaterally drafted a "contract" between himself and Stokes, forging the latter's signature on the signature line, purporting to allow him to share profits with Stokes. (Stokes intends to hire a handwriting expert in discovery that will conclusively establish that his signature was forged, and by Buenrostro, on this document.)

22. In addition, to facilitate this fraudulent scheme, Stokes has recently learned, Buenrostro forged and/or endorsed bank checks with Stokes' signature.  (Again, it is certainly expected that a handwriting analysis expert will uncover that the putative signatures of Stokes appearing on any and all checks from and/or to Injury Loans while Stokes was in the hospital, were forged, and forged by Buenrostro.)

23. Further to facilitate his fraud, Buenrostro committed bank fraud—assisted by the negligence of the bank—by opening up business bank accounts at Citibank in Las Vegas, Nevada, to deposit his fraudulent proceeds into, to give the impression to third parties that his activities were sanctioned by Stokes, and/or Injury Loans.

24. At no point has Stokes ever owned or operated a bank account with Citibank.  Yet, Stokes has recently learned that Citibank has documents purporting to bear his "signature," which even to the untrained eye do not look like Stokes' signature, and in some cases, bear little resemblance to Stokes' signature.  To perpetuate his fraud, Buenrostro purported to share this account with Stokes, and/or to have opened it with Stokes' authorization.

25. Stokes has also recently come into possession of a forged Citibank document purporting to be a "signature" card, with the heading, "Joint Holder Deposit Consent Form," that has Stokes' signature forged on it.  Stokes obtained a copy of this document from one of the attorneys, upon information, Mr. Garelli, with whom Buenrostro "negotiated" loans while Stokes was hospitalized in Texas.

26. Stokes took the forged Citibank form document to the local branch of the bank (at "The Lakes"), approximately a couple weeks ago, and learned from one of the bank executives that the document is a fugitive document that not one person at the local branch had ever before seen, and which was not in circulation at the date of "signing" by Buenrostro, and the forged signature of Stokes.  Stokes looked for, and located a template of this "Joint

Holder Deposit Consent Form" online, and found it on a Citibank India website.

27. To the naked eye, the forged signatures of Stokes on all of the fraudulent checks and contract by Buenrostro, as well as the Citibank document, appear to be made by the same person—Buenrostro.   Citibank has or had retained checks fraudulently endorsed with Stokes' names by Buenrostro.

28. Although Buenrostro is believed to have displayed this document to third parties as evidence of his purported banking relationship with Stokes, Citibank represented to Stokes that the fraudulent document had never been submitted to the bank.   None of the bank employees consulted by Stokes had seen the signed form with Buenrostro's signature, with Stokes' forged signature, or the form in general, before.

29. According to Citibank, the document was not prepared by the bank, and no one had ever seen it completed.   None of the bankers had ever seen it before.   Indeed, the bank represented to Stokes that the "Joint Holder Deposit Consent Form" with Stokes' forged signature was not part of the bank's file.

30. Citibank indicated that another person's name (aside from Buenrostro's and Stokes' faked name) was on the account, but Citibank would not disclose the name of this person to Stokes, and Stokes does not know who this person might be.   Citibank represented to Stokes that it has and maintains a paper file on Buenrostro's fraudulent account.

31. At the same time, having been presented with this false, fugitive document with Citibank's logo on it, with an existing account number with Buenrostro's signature, and Stokes' forged signature, should have precipitated extreme care on the part of Citibank, which should have taken steps to protect Stokes, who, it was now clear, had not authorized the account, if they had not before.   Citibank, to date, upon information and belief, has not transmitted their file on this matter to its corporate office, nor reported it to any law enforcement,

administrative agency, or federal or state banking agency.

32. Stokes has become aware that Buenrostro did not report the sums that he had embezzled or appropriated from Stokes or the company to the bookkeeper, so that they would not show "on the books."

33. At no point did Buenrostro have permission to cash any checks on Stokes' or Injury Loans' behalf, nor did he at any point have permission to negotiate loans on their behalf, or to open a bank account for Stokes, neither while Stokes was operating the company day-to-day, nor while he was ill in the hospital.

34. Buenrostro, for his part, has previously admitted to having appropriated funds of Stokes and/or Injury Loans, (though not to the extent that has been discovered, and not with respect to the injury loans) and when confronted about the more minor theft he committed during Stokes' absence from the company, voluntarily agreed to "repay" Stokes two thousand dollars ($2,000.00).

35. Thereafter, Buenrostro met with an agent of Stokes and returned eight hundred dollars ($800.00) in cash, and a check for twelve hundred dollars ($1,200.00), which bounced. Stokes had previously terminated Buenrostro's employment.

36. Stokes has learned that Buenrostro also registered a Fictitious Firm Name (FFN) with the state in his and Stokes' name, in or near November 17, 2016. Stokes has never owned nor partnered a corporation with Buenrostro and did not authorize this filing. In mid-November, including on the date in question, Stokes had been hospitalized for emergency spine surgery.

37. Upon information and belief, Buenrostro, approximately 30 years old, has a history of impersonating others' identities, as well as using, creating, and/or selling fraudulent, illegal documents. It has recently come to Stokes' attention that Buenrostro was prosecuted

and/or convicted for possession or selling documents for the purpose of "selling false status" in Justice Court for Clark County, Nevada in November 2009. Very shortly before that, also in November 2009, Buenrostro was prosecuted and/or convicted for two counts of possession of false identification, in the same jurisdiction.

38. Stokes has discovered that on or near December 4, 2017, Buenrostro forged a fake email purporting to be from Stokes to himself (Buenrostro), in which Buenrostro, impersonating Stokes, says in the email, "Yes, we did take out, slush. Needed that one. I have been with the doctors all day. Come by soon." The listed time of the email was 5:35pm. This was entirely fake. At the day and time that the email was purportedly sent, Stokes was traveling to Mexico. Stokes has an airline ticket and itinerary, as well as credit card charges, documenting that fact.

39. Stokes could not have been "with the doctors all day," nor would he have invited Buenrostro to "come by soon," as Stokes was out of the country. He was actively traveling at the time of the alleged email, and the IP address that sent the email, upon information and belief, will <u>not</u> show that it was sent from Mexico.

40. In reviewing emails that Buenrostro forwarded to Mr. Garelli, of purported conversations between Stokes and Buenrostro, Stokes realized that few, if any, of the emails that Buenrostro had forwarded to Mr. Garelli had actually occurred. Stokes did not find them in his record of his "Outbox" or "Sent" file. In printing and closely scrutinizing the emails, it is evident that some dates were manipulated or doctored, with warped numbers and letters. For example, one entry appeared as: "September **07**, 2017 3:06 PM" The **"07"** was bold, while the rest of the date was in normal shading. It appeared to be pasted in. If viewed on a computer screen, the color of the screen behind the "07" appears white instead of grey like the rest of the space around it. Moreover, upon information and belief,

Microsoft Outlook's dates rubric omits the zero before the date. The two emails sent by Buenrostro with "07" in the date are Microsoft Outlook emails, and thus should have been appeared as "September 7" instead of "September 07."

41. In some of these forged emails, Stokes appears to have copied Buenrostro on emails to someone in Mr. Garelli's office, but that was not the case.  In other forged emails, Buenrostro and Stokes ostensibly discuss a "slush" fund (where Buenrostro secreted money he obtained by fraudulently negotiating Injury Loan's loans), but that was also not the case. Stokes is not aware of any so-called "slush" fund, does not have a so-called slush fund, and has never authorized Buenrostro to open or operate a slush fund.

42. Specifically, also, Buenrostro has misrepresented to third parties, that Stokes always knew what Buenrostro was doing, and sanctioned it, including opening a joint bank account in his name.  This is also false.

43. Buenrostro has alleged that he personally traveled to Stokes' residence to "drop off checks" from his scheme, leaving them at Stokes' residence for him when the latter returned to Las Vegas from the hospital.  Not only is this false, but preliminary reports from Stokes' visitor log surveillance at his gate guarded residence demonstrates that Buenrostro did not visit Stokes' residence at the times that he says he did.

44. Buenrostro has attempted to demonstrate that he was an "independent contractor" which he ostensibly believes gave him authority to do these fraudulent transactions (which status would not grant him this authority in any case); but even still, he was not subject to a 1099, but a w-2, for an employee, not an independent contractor.

45. Neither Stokes nor Injury Loans had ever cashed loan payments to Buenrostro prior to Stokes' illness, and this could only have been accomplished through Buenrostro's illegal activity.  Nor was Buenrostro entitled to any proceeds or payments from any of the loans.

46. Upon information and belief, Buenrostro has not reported this income, the proceeds he swindled from the injury loans, to the Internal Revenue Service (IRS).

47. Buenrostro also forged emails (some of which are obviously doctored when printed out and viewed closely) ostensibly containing Stokes on "cc" lines, when Stokes never received these emails or notice of these emails.  Tellingly, Buenrostro used a "Gmail" address to communicate with third parties, instead of the company's email address, under the rubric, "injuryloans.com"

48. It is believed that Buenrostro benefited in the approximate amount of $137,500.00 in his fraudulent scheme, but the potential legal and/or equitable value of the loans reasonably far exceeds this amount.

49. Specific dates of checks that Stokes has been able to verify that Buenrostro embezzled are: May 30, 2017 (1 check); September 7, 2017 (2 checks); September 8, 2017 (1 check); October 4, 2017 (1 check); October 25, 2017 (2 checks), from what is now a closed bank account.

50. From May 22, 2017 through July 1, 2017, just a few of the range of dates that Buenrostro purports to have met with Stokes, Stokes was in a medical facility in Texas, recovering from his aneurysm, and could not have met with Buenrostro.

51. Prior to that, from May 2, 2017 to May 22, 2017, Stokes was incapacitated at University Medical Center (UMC) in critical care, without being able to use either a telephone or computer (and in fact, had no access to either).

52. In fact, Buenrostro is, upon information and belief, still committing fraud, and approximately a couple weeks ago, Citibank sent an alert to Stokes letting him know that Stokes' cell phone was added to the account.  Despite having been notified of fraud by Buenrostro, Citibank still took inadequate steps to protect Stokes, and continued to allow

Buenrostro to make changes to the account.

53. Citibank sent Stokes a text message to inform him of a "change to his telephone" on a Citibank account that Buenrostro had set up.  Stokes, who did not authorize the Citibank checking account in the first place, also did not authorize the change in telephone number. Upon information and belief, Buenrostro added Stokes' actual telephone number to this account after discovering Stokes' investigation into the account.  Buenrostro, upon information and belief, also added his personal cell phone number to the account.

54. Buenrostro, upon information and belief, is a registered and/or licensed notary, and may have falsely notarized Stokes' forged signature on certain documents, to assist in his fraud, which was made easier by his having worked for Stokes and having become familiar with his handwriting.

55. Stokes filed a police report against Buenrostro, which was initially joined by Mr. Garelli. Upon information and belief, the Las Vegas Metropolitan Police Department (LVMPD) initiated a criminal investigation into Buenrostro, regarding which Stokes has volunteered substantial assistance.  Stokes has offered to provide a handwriting analysis to the LVMPD, and to allow them to access his personal emails and other documents.

56. With respect to these injury loans, apparently, Buenrostro has misrepresented to third parties, including the LVMPD, that he not only had authorization from Stokes to negotiate injury loans and accept proceeds, but that he also transferred a portion of the proceeds to Stokes while the latter was in the hospital.  This is demonstrably false.

**III.     FIRST CLAIM FOR RELIEF--(CITIBANK: Negligence)**

57. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

58. As part of the duties that Citibank owed to the plaintiffs was checking customer

identification, and conducting a process whereby a third-party would not be linked to a bank account without its permission.

59. Citibank did not required Buenrostro to provide the plaintiffs' driver's license, passport, certified articles of incorporation, government-issued business license, partnership agreement, financial references, financial statement, or any other information that would reasonably assure the bank that their customer's identity, and authorization to open an account was real.

60. Citibank failed to conduct due diligence in accepting the transactions by Buenrostro, and his putative co-signer (the plaintiff, Adam Stokes), which would have enabled it to predict anomalies in the banking behavior of Buenrostro, which could have saved the plaintiffs harm. Due diligence in verifying Buenrostro would have alerted the bank to the need to assign him a risk rating that would have determined a much greater amount of account monitoring and scrutiny.

61. Citibank, upon information and belief, failed to require Buenrostro to provide any corporate documents to substantiate his opening a bank account, and using a fictitious business name, such as Injury Loans, to do so.

62. The Bank Secrecy Act ("BSA") is designed to deter money laundering by requiring a paper trail of cash transactions exceeding $10,000 and improving detection and investigation of criminal and terrorist activities.

63. The BSA requires financial institutions to have a BSA compliance program that includes, at a minimum, written policies and procedures, currency transaction reporting and record keeping requirements for the cash purchase of monetary instruments between $3,000 and $10,000 inclusive.

64. The BSA also requires reporting of suspicious activity, five-year record retention, a

designated BSA Compliance Officer, a Customer Identification Program (required under the USA Patriot Act), ongoing employee training programs, and an independent audit function implemented to test functions.

65. The USA Patriot Act is a comprehensive anti-terrorism legislation that expands the responsibilities of United States financial institutions to prevent money laundering and terrorist activities. All bank associates must comply with the USA Patriot Act.

66. The BSA/Money Laundering Examination Manual issued by the Federal Financial Institutions Examination Counsel, revised in 2007, lists money laundering red flags. Some of the red flags listed in the Examination Manual are customers who are reluctant to comply with reporting or record keeping requirements and wire transfers to/from a financial secrecy haven or a high-risk geographical location without an apparent business reason.

67. A bank's identification of one or more of these red flags may require the bank to conduct necessary actions under the BSA. The BSA requires banks to file Suspicious Activity Reports ("SAR") with respect to any transaction involving at least $5,000 which the bank suspects "involves funds derived from illegal activities."

68. Citibank is required to "Know Your Customer." That policy requires, among other things, that Citibank and its employees to understand the normal and expected transactions of the customer's business, to review activity that varies significantly from normal and expected activity, and document findings and report unusual or suspicious activity. One of the types of criminal activity that may be hidden through money laundering is fraud.

69. Certain customers are subject to special requirements to mitigate the risk of money laundering. These types of customers require additional due diligence. Among those types of customers requiring such additional due diligence are Financial Institutions, including loan companies, such as the one that Sergio Buenrostro purported to be running.

70. A customer's industry, or nature of business, should be used by Citibank to classify the customer with similar customers for risk and ranking, and monitoring and surveillance purposes, and provides basic information regarding the source of an industry's funds. In order to perform an adequate risk assessment, Citibank's employees were required to understand the normal and expected transactions of a customer's business.

71. Citibank associates, through interactions with customers and through completion of day-to-day job functions, are in a position to identify and refer unusual or potentially suspicious activity. Each branch must have a process in place to report money laundering and related unusual or suspicious activity to the bank's global financial intelligence unit, and/or the money laundering reporting officer.

72. Citibank's ethical requirements mandate that its employees participate in anti money-laundering efforts, and be able to recognize red flags and report potentially suspicious or unusual activities, as well as, make reasonable efforts to determine the true identities of all customers, and follow all "Know Your Customer" procedures.

73. Due diligence on the part of Citibank required, among other things, collecting information about the customer for money laundering risk management throughout the life of the relationship of Citibank.

74. Considering Buenrostro's activities and criminal history, it would have been a basic part of Citibank's due diligence to inquire as to the source of funds, purpose of the account, occupation, financial statements, banking references, description of business operations, and other such information. All of this would have prevented or mitigated the fraud against the plaintiffs, and serve as an anti-money laundering preventive measure.

75. The Patriot Act requires a bank to file a suspicious activity report if it suspects, or has reason to suspect, irregular activity. But not knowing their customers, Citibank failed in

its duty, and such failure constituted negligence that caused the plaintiffs harm.

76. All of the obligations alleged above was required under the bank's KYC rules, and specifically its CIP and CDD obligations, and the breach of which, constituted negligence, as well as the actions themselves (whether or not the bank was required to comply with the KYC/CIP/CDD).

77. Citibank owed the plaintiffs a duty to act with reasonable care and to exercise the ordinary skill and ability commonly exercised by banking professionals. In failing to carry out even the most basic protections to avoid having a third-party implicated or harmed in a fraudulent banking scheme, breached that duty.

78. The plaintiffs were harmed financially and reputationally when Buenrostro, with no oversight or challenge from Citibank, placed Stokes' name on his account, without his permission, and used the account to secret and launder money that he had appropriated from Stokes' legitimate injury loans business, and/or attorney referrals.

79. Citibank, by way of its negligence, was the proximate cause of this harm, or Citibank's conduct was a substantial factor in causing harm to the plaintiffs.

80. Furthermore, there was no negligence or any want of due care on the plaintiffs' part.

81. As a direct and proximate result of the negligence of Citibank, plaintiffs have suffered financial loss, reputational loss, loss of Goodwill, and consequential damages, the exact amount of which, or a financial equivalent of which, will be proven at trial.

82. The plaintiffs are entitled to attorneys' fees and costs, as well as interest, where appropriate, as a foreseeable consequence of Citibank's negligence.

**IV.   SECOND CLAIM FOR RELIEF--(BUENROSTRO: Fraud/Intentional Misrepresentation)**

83. Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

84. As described more particularly in the Factual Allegations (which are herein incorporated), Buenrostro has engaged in illicit, illegal, and unauthorized transactions that have put in jeopardy the reputation and Goodwill of Injury Loans (the corporate plaintiff), and the reputation and professional license of Stokes (the individual plaintiff), as well as their financial well-being.

85. Buenrostro has fraudulently forged Stokes' signatures on various documents, including a fraudulent contract and bank forms.  He has negotiated loans to which he had no authority to negotiate, and collected proceeds therefrom, to which he was not entitled.

86. Buenrostro has acted in bad faith by promising to repay some of what he appropriated, but then passing a bad check on the plaintiffs.

87. Upon information and belief, Buenrostro conspired with a third party to collect proceeds that more properly belong to the plaintiffs, and secretly deposited them in the deceptive Citibank account.

88. Buenrostro has converted over a hundred thousand dollars in Injury Loans funds, as well as Stokes' personal funds, and/or third parties' funds.

89. In so doing Buenrostro deceived third parties with harm to the plaintiffs, unilaterally changing dates, times, and documents, to falsely represent to third parties that Buenrostro was acting with authority from the plaintiffs.

90. Buenrostro, upon information and belief, continues to accept unauthorized funds from third parties, and operates a bank account associated, without authorization, with the plaintiffs.

91. Buenrostro has deceptively manipulated email messages to appear as though they come from the plaintiffs when they do not, in order to facilitate his fraud against the plaintiffs and third parties.  Buenrostro has made several false representations that he knew was false.

92. Buenrostro intended to induce third parties, including, by example, Mr. Garelli, to

"purchase" loans of Injury Loans, concerning which Buenrostro had no authority to sell, or negotiate profits or proceeds.

93. Buenrostro also intended to induce Citibank to allow him a way to launder the money that he took by deception, deceiving the bank into believing that Stokes was a party to the account that he created.

94. Other parties justifiably relied upon Buenrostro's false representations, as described herein. This has caused those parties, as well as the plaintiffs, to lose substantial assets, as well as reputation, and Goodwill.  In addition, the plaintiffs may owe obligations to third parties as a result of Buenrostro's fraud.

95. The plaintiffs have thus sustained damages as a proximate cause of Buenrostro's fraud.

96. The plaintiffs are not aware exactly how much money Buenrostro has embezzled, but as aforementioned, it is in the neighborhood of over one hundred thousand dollars.

97. The dates upon which Buenrostro committed these acts are known to be *at least* within May 2017 to the present, but may have occurred on earlier dates, as well, which is expected to be ascertained through discovery, and proven at trial.

98. As a result of Buenrostro's fraudulent activities, the plaintiffs continue to suffer damages, the exact amount to be determined at trial.

99. As a further proximate result of Buenrostro's intentional misrepresentations, the plaintiffs are entitled to punitive damages in an amount to be proved at trial.

**V.  THIRD CLAIM FOR RELIEF--(BUENROSTRO: Civil RICO, 18 U.S.C. § 19 and NRS 207.470)**

100.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

101.     "Mail fraud" consists of the use of any fraudulent scheme to intentionally deprive another of property or legitimate services, and/or in furtherance of the scheme, relying in

any way upon the United States mail, or making any false representations by means of the United States mail.

102.     "Wire fraud" consists of the use of any fraudulent scheme to intentionally deprive another of property or legitimate services, and/or in furtherance of the scheme, relying in any way upon telephone communications, electronic communications, or an interstate communications facility.

103.     The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. sections 1961-1968, is directed at "racketeering" activity, defined in section 1961(1) to encompass, *inter alia,* acts "indictable" under specific federal criminal provisions, including mail and wire fraud.

104.     18 U.S.C. section 1964(c) prohibits conducting or participating in the conduct of an enterprise "through a pattern of racketeering activity."  This section also provides for a civil right of action for any person injured in his or her business or property "by reason of a violation of section 1962," to recover *treble* damages.

105.     Buenrostro, in conjunction with, a currently unknown third party, or third parties, and under the auspice of Injury Loans (without knowledge or authorization by its owner), and by way of his own, private enterprise, has engaged in a pattern of "racketeering activity."

106.     Buenrostro, upon information and belief, used the United States mail, to send fraudulent documents, forms, fake contracts, copies of checks, and/or other materials to third parties in furtherance of his illegal and illicit scheme to defraud Stokes.

107.     Buenrostro used the telephone to communicate about, and electronic mail (email), to communicate about, and to send fraudulent documents, forms, fake contracts, copies of checks, and/or other materials to third parties in furtherance of his illegal and illicit scheme

to defraud Stokes.

108.     Buenrostro has fraudulently obtained money and wired or deposited it into bank accounts controlled by himself.  Buenrostro has collected monies from attorneys and/or other third parties with whom the plaintiffs have a relationship, where he was and/or is not authorized, defrauding both the plaintiffs, and the applicable innocent third parties.

109.     Buenrostro has also made false assertions to third parties by way of telephone, mail and email.

110.     Buenrostro has fraudulently filed, or caused to be filed, false information to Citibank.

111.     Consequently, Buenrostro violated a predicate racketeering act.

112.     The plaintiffs have suffered injury in their business and/or property by reason of Buenrostro's violation of the predicate racketeering act and/or acts.

113.     Buenrostro's violation proximately caused the plaintiffs' injury.

114.     The plaintiffs did not participate in the racketeering violations.

115.     Therefore, the plaintiffs are entitled to damages under either the federal statute and/or state statute, and may recover up to three times actual damages sustained.

116.     Injury Loans and Stokes have been injured, as described above, by reason of Buenrostro's violation of section 1962 and thus, may prosecute their claims against Buenrostro pursuant to RICO for treble damages.

117.     Nevada law also provides for a civil rights of action for racketeering, with the predicate acts of wire and/or mail fraud, pursuant to Nevada Revised Statutes (NRS) 207.470.

118.     As described above, Buenrostro has engaged in several illicit and illegal predicate acts or crimes related to racketeering as defined in NRS 207.360, including embezzlement

of money or property valued at $250.00 or more, obtaining possession of money or property valued at $250.00 or more by false pretenses, and/or taking property from another under circumstances not amounting to robbery.

119.     Buenrostro has, with criminal intent, received proceeds from loan payments on personal injury cases from racketeering activity as set forth herein, and has used those proceeds for his own personal use in violation of NRS 207.400(1)(a).

120.     Further, though not necessary to this claim for racketeering, Buenrostro has made personal threats to Stokes and his wife, threatening their personal safety and well-being, as retaliation for their expressing to him their intention of pursuing this matter with the court, and law enforcement.

121.     As a direct and proximate result of Buenrostro's wrongful actions, the plaintiffs have suffered and will continue to suffer damages, the exact amount to be determined at trial.

122.     Buenrostro's wrongful actions were done with improper motives and with willful, wanton, or reckless disregard of the plaintiffs' rights, or were done oppressively, or with malice.  Injury Loans and Stokes are, therefore, entitled to punitive and treble damages.

123.     Plaintiffs have suffered additional damages in the form of attorney fees as a proximate and foreseeable result of Buenrostro's wrongful conduct.

**VI.      FOURTH CLAIM FOR RELIEF--(BUENROSTRO: Unjust Enrichment)**

124.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

125.     Buenrostro has absconded with the money and/or property of the plaintiffs in the Injury Loans practice, which rightly should have been turned over to the plaintiffs, by negotiating directly with third parties to "sell" loans over which he had no authority, and

pocketing the funds into a bank account that he controls for his own use.

126.    Buenrostro has thus unjustly retained the money of the plaintiffs against fundamental principles of justice or equity or good conscience.

127.    Buenrostro has also, upon information and belief, appropriated funds to himself properly belonging to the plaintiffs and/or third parties to whom the plaintiffs may have a financial, moral, and/or legal obligation to compensate.

128.    Buenrostro has also retained other monies and/or properties that he should be required to disgorge.

129.    Buenrostro should be required to disgorge the benefits he has received by engaging in fraudulent negotiations (for which he had no authorization), as well as, forgery, and/or violating any and all laws, ethical obligations, and any and all agreements, in dealing with the plaintiffs, and/or other third parties to whom the plaintiffs have an obligation.

130.    The value of the money and property unjustly retained by Buenrostro will be determined at trial.

131.    In addition, the plaintiffs have suffered damages in the form of attorney fees as a proximate and foreseeable result of Buenrostro's retention of the money and property of the plaintiffs.

**VII.      FIFTH CLAIM FOR RELIEF--(BUENROSTRO: Civil Conspiracy)**

132.    Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

133.    Civil conspiracy consists of defendants, acting in concert, intending to accomplish an unlawful objective for the purpose of harming plaintiffs, and plaintiffs sustain damage resulting from defendant's act or acts.

134.    Upon information and belief, Buenrostro, in concert with a third party, or third

parties, accomplished the goals of defrauding the plaintiffs of proceeds or profits from the Injury Loans business, by negotiating directly with third parties, among other things, and secreting the funds in an account over which Buenrostro exercised partial or full control.

135.     Although it is not fully known at the time of the drafting of this complaint the names of all third parties who assisted in this conspiracy with Buenrostro against the plaintiffs, it is believed that such information will become available during discovery, and proved at trial.

136.     As a direct and proximate result of Buenrostro's and third parties' conspiracy, the plaintiffs have sustained damages in an amount to be determined at trial.

137.     As a further proximate result of Buenrostro's and third parties' conspiracy, the plaintiffs are entitled to punitive damages in an amount to be proved at trial.

## VIII.   SIXTH CLAIM FOR RELIEF--(BOTH DEFENDANTS: Injunctive Relief)

138.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

139.     **Buenrostro** must cease negotiating with any third parties with respect to Injury Loans and/or Stokes.

140.     **Buenrostro** must cease collecting any proceeds concerning any clients of Injury Loans and/or Stokes.

141.     **Buenrostro** must cease operation of any bank account to which he has affixed Stokes' and/or Injury Loans' name or approval, and immediately void any and all transactions with any third parties for which he is neither authorized, qualified, licensed, nor approved.

142.     **Buenrostro** must disburse the funds he has in his possession that he has illicitly gained from the plaintiffs, including, but not limited to, proceeds or profits from Injury

Loans.

143.     **Buenrostro** must immediately cease using the business name "Injury Loans" or the individual plaintiff's name, "Adam Stokes" in any way.

144.     **Buenrostro** must immediately close, and/or cease opening lines of credit, or obtaining credit cards, using the plaintiffs' name or association.

145.     **Buenrostro** must stop defaming or putting into a false light the plaintiffs, by telling third parties that his illicit and illegal actions were sanctioned or approved in any way by the plaintiffs, and/or holding himself out to be in association with the plaintiffs, and/or making threats of any kind to the plaintiffs (which he has on occasion already done to the plaintiffs in connection with this matter).

146.     **Citibank** must immediately cease allowing Buenrostro to operate an account with Stokes and/or Injury Loans as signers, joint owners, or concerning them in any way.

147.     **Citibank** must immediately cease allowing Buenrostro to withdraw and/or control any funds on accounts that have Stokes and/or Injury Loans as signers, joint owners, or concerning them in any way.

148.     **Citibank** must immediately cease allowing Buenrostro to make any changes of any kind to any and all bank accounts (including change of telephone number) associated in any way with Stokes and/or Injury Loans.

**IX. SEVENTH CLAIM FOR RELIEF--(BOTH DEFENDANTS: Declaratory Relief)**

149.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

150.     Plaintiffs are not bound by any fraudulent agreement that they neither drafted, discussed, nor signed with Buenrostro.  The court should declare invalid any fictitiously created documents with forgeries of Stokes' signatures by Buenrostro.

151.     Plaintiffs are not bound by any fraudulent bank account that they neither opened, nor authorized, nor approved, nor signed.  The court should declare invalid any fictitious banking documents and/or checks with forgeries of Stokes' signatures by Buenrostro.

**WHEREFORE**, plaintiffs, and each of them, pray for the following relief:

1. Compensatory and consequential damages;
2. Attorneys' fees and costs of suit;
3. For punitive damages;
4. For declaratory and injunctive relief;
5.  For prejudgment and post-judgment interest as provided by law;
6.  Jury trial, if need be, on all issues against any and all defendants;
7.  For any other relief that the court deems appropriate.

Dated this 5th day of October, 2018.

 _/s/ Telia U. Williams_
Telia U. Williams, Esq.
10161 Park Run Drive, Suite 150
Las Vegas, Nevada 89145
*Attorneys for plaintiffs*