1

2

_____
*The Above Space Reserved for the Clerk of Court*

GALLAGHER LAW, Prof. Corp.
Kathleen H. Gallager, Esq.
Nevada State Bar Number 15043
1850 East Sahara Avenue, Suite 107
Las Vegas, Nevada 89104
Telephone: (702) 744-8086
Email: kathleen@legalmusclelv.com

ANDERSEN & BROYLES, LLP
Karl Andersen, Esq.
Nevada State Bar Number 10306
5550 Painted Mirage Road, Suite 320
Las Vegas, Nevada 89149
Telephone: (702) 220-4529
Facsimile:  (702) 834-4529
Email: karl@andersenbroyles.com
*Attorneys for Plaintiffs Injury Loans.com, LLC*
*and Adam Stokes*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| INJURYLOANS.COM, LLC, a Nevada entity; ADAM STOKES, an individual,<br>　　　　　Plaintiffs,<br>vs.<br><br>SERGIO BUENROSTRO, an individual; SANDRA MARTINEZ, an individual; CITIBANK, N.A., an entity, S&S MARKETING CONSULTING, LLC, a Nevada limited liability company,<br>　　　　　Defendants.<br>_____<br>CITIBANK, N.A.,<br>　　　　　Cross Claimant,<br>vs.<br><br>SERGIO BUENROSTRO,<br>　　　　　Cross Defendant, | Case No.: 2:18-cv-01926-GMN-VCF<br><br><br><br><br><br>**FIRST AMENDED COMPLAINT**<br><br>**Jury Trial Demand** |

CITIBANK, N.A.,

               Third-Party Plaintiff,

vs.

S&S MARKETING CONSULTING, LLC
               Third-Party Defendant.

Plaintiffs InjuryLoans.com, LLC and Adam Stokes complain and allege as follows:

**I.**       **JURISDICTION, PARTIES, AND VENUE**

1.       This action arises in part under the statutes of the United States for violations by defendant Sergio Buenrostro and defendant Sandra Martinez of Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.*

2.       This action also arises under Know Your Customer (KYC) regulations, specifically the Customer Identification Program (CIP), and Customer Due Diligence (CDD), and general negligence of a federally-insured bank, defendant Citigroup, Inc.

3.       As such, this court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this matter arises as a result of alleged violations of federal law.

4.       This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over plaintiffs' state law claims as they form part of the same case or controversy.

5.       Defendant Citigroup, Inc. ("Citibank" or "the bank") is a publicly-traded company with regular operations in Clark County, Nevada.

6.       At all relevant times, defendant Citibank's agents and employees were acting in the course and scope of their employment and/or agency.

7.       Defendant Sergio Buenrostro ("Buenrostro") is an individual who resides in Clark County, Nevada.

8.       Defendant Sandra Martinez ("Martinez") is an individual who resides in Clark

County, Nevada.

9.        Defendant S&S Marketing Consulting, LLC. ("S&S Marketing") is a Nevada limited liability company.

10.        Plaintiff Adam Stokes ("Stokes") is an individual who resides in Clark County, Nevada.

11.        Plaintiff InjuryLoans.com, LLC ("Injury Loans" or the "company") is an entity that resides and regularly does business in Clark County, Nevada.

12.        Plaintiffs may be aware of an individual defendant, and/or other entity, that has not yet been named, who may be liable; plaintiffs intend to amend this complaint once this individual and/or entity is known, if feasible and/or appropriate.

13.        Venue is appropriate in this court under 28 U.S.C. § 1391, as the events complained of happened in Clark County, in the District of Nevada, and the defendants are subject to this court's personal jurisdiction.

## II.        FACTUAL ALLEGATIONS

14.        Stokes is an attorney and business owner who owns and operates, among other things, Injury Loans.

15.        Injury Loans finances plaintiffs in personal injury lawsuits in exchange for reimbursement plus interest from a part of their anticipated recovery at the resolution of their cases.

16.        Stokes became acquainted with Buenrostro when the latter worked as a legal assistant to Stokes' ex-wife. Buenrostro, as Plaintiffs' employee and/or agent, later assisted Stokes as an administrator in operation of Stokes' company.

/ / /

17.       Among Buenrostro's duties was to communicate with third parties, including the attorneys handling personal injury cases, and intermediaries, (including attorney brokers of the loans), and to assist in administering the paperwork, documentation, and pay-outs of the loans, under Stokes' supervision.

18.       Stokes suffered a debilitating head and brain injury in 2017 that had him hospitalized and severely incapacitated for several months out of the jurisdiction.

19.       Buenrostro continued as Plaintiffs' employee and/or agent into 2017 and possessed a mail key to access Plaintiff's mail.

20.       At this time Buenrostro was in a relationship with Martinez. Martinez knew Buenrostro worked for Stokes and that Stokes owned Injury Loans.

21.       While Stokes was thus incapacitated, Buenrostro "sold" loans belonging to Injury Loans to third parties, intercepted checks from Plaintiffs mail box, deposited these checks with Defendant Citigroup and collected proceeds to which he was not entitled, but which belonged to Injury Loans and/or Stokes.

22.       Buenrostro represented that he had authorization to collect monies on behalf of Stokes, which was not true, and then appropriated the funds to himself.

23.       In the way of one example, Buenrostro took loans on which Injury Loans was owed literally hundreds of thousands of dollars, and "sold" them to third parties, including, but not limited to, attorney Brian Garelli, Esq., who operates a national injury loan practice, Preferred Capital, for less than their face value, and pocketed the proceeds, or most of the proceeds, without informing Stokes of the same. Buenrostro sold some of the same loans to another lender.

/ / /

/ / /

24.     To facilitate this fraud, Buenrostro:

a.  unilaterally drafted a "contract" between himself and Stokes, forging the latter's signature on the signature line, purporting to allow him to share profits with Stokes;

b.  forged and/or endorsed bank checks with Stokes' signature;

c.  Opened a company named S&S Marketing Consulting, LLC ("S&S") and filed for an FFN (fictitious firm name) of "Injury Loans" in Clark County;

d.  committed bank fraud—assisted by the negligence of the bank—by opening up business bank accounts at Citibank in Las Vegas, Nevada, under the name of S&S, and then deposited the checks payable to Injury Loans.com, LCC into S&S's account. Buenrostro gave the impression to third parties that the activities were sanctioned by Stokes, and/or Injury Loans;

e.  added Martinez to the business bank account of S&S. Martinez knew Buenrostro did not have ownership of Injury Loans, she knew that almost all of the funds in the S&S business account was derived by depositing checks made payable to Injury Loans, but nonetheless, Martinez used the S&S business account to make over $50,000 personal purchases at stores like Christian Louboutin, Canyon Falls Hair Salon, Chanel, Haute Bride Salon, Louis Vuitton, Victoria's Secret, Ulta, Sephora and many others;

f.  represented to other parties that he shared this Citibank account with Stokes, and/or to opened it with Stokes' authorization by using Citibank documents purporting to bear Stokes' signature.

///

///

25.     Stokes came into possession of a forged Citibank document purporting to be a "signature" card, with the heading, "Joint Holder Deposit Consent Form," that has Stokes' signature forged on it.  Stokes obtained a copy of this document from one of the attorneys, upon information, Mr. Garelli, with whom Buenrostro "negotiated" loans while Stokes was medically incapacitated and without Stokes' consent or knowledge.

26.     Stokes took the forged Citibank form document to the local branch of the bank (at "The Lakes") learned from one of the bank executives that the document is a fugitive document of a sort that not one person at the local branch had ever before seen, and which was not in circulation in Nevada at the date of "signing" by Buenrostro, and the forged signature of Stokes.  Stokes looked for, and located a template of this "Joint Holder Deposit Consent Form" online through Citibank India.

27.     To the naked eye, the forged signatures of Stokes on all of the fraudulent checks and contract by Buenrostro, as well as the Citibank document, appear to be made by the same person—Buenrostro.  Citibank has or had retained checks fraudulently endorsed with Stokes' names by Buenrostro.

28.     Although Buenrostro is believed to have displayed this document to third parties as evidence of his purported banking relationship with Stokes, Citibank represented to Stokes that the fraudulent document had never been submitted to the bank.  None of the bank employees consulted by Stokes had seen the signed form with Buenrostro's signature, with Stokes' forged signature, or the form in general, before.

29.     According to Citibank, the document was not prepared by the bank, and no one had ever seen it completed.  None of the bankers had ever seen it before.  Indeed, the bank represented to Stokes that the "Joint Holder Deposit Consent Form" with Stokes' forged signature was not part of the bank's file for S&S.

30.     At the same time, having been presented with this false, fugitive document with Citibank's logo on it, with an existing account number with Buenrostro's signature, and Stokes' forged signature, should have precipitated extreme care on the part of Citibank, which should have taken steps to protect Stokes, who, it was now clear, had not authorized the account, if they had not before.  Citibank, to date, upon information and belief, has not transmitted their file on this matter to its corporate office, nor reported it to any law enforcement, administrative agency, or federal or state banking agency.

31.     Stokes has become aware that Buenrostro did not report the sums that he had embezzled or appropriated from Stokes or the company to the bookkeeper, so that they would not show "on the books."

32.     At no point did Buenrostro have permission to sell loans without the knowledge or consent of Stokes, nor did he have permission to deposit Plaintiff's checks into a bank account unknown to Stokes, nor did he have permission to sign Stokes' signature to checks to be deposited into the Citibank account.  He also did not have permission to file a fictitious firm name with Clark County purporting to allow S&S to do business as Injury Loans.

33.     Buenrostro, for his part, has previously admitted to having appropriated funds of Stokes and/or Injury Loans, (though not to the extent that has been discovered) and when confronted about the then discovered theft he committed during Stokes' absence from the company, voluntarily agreed to "repay" Stokes two thousand dollars ($2,000.00).

34.     Thereafter, Buenrostro met with an agent of Stokes and returned eight hundred dollars ($800.00) in cash, and a check for twelve hundred dollars ($1,200.00), which bounced.  Stokes had previously terminated Buenrostro's employment.

35.     Buenrostro, for his part, previously admitted to having misappropriated funds of

Injury Loans and/or Stokes to attend three Asian massage parlor visits in one evening for which Buenrostro acknowledged in writing his intention to repay the unauthorized removal of money.

36.      Stokes has learned that Buenrostro also registered a Fictitious Firm Name (FFN) with Clark County, Nevada , on or about November 17, 2016.  Stokes has never owned nor partnered in a corporation with Buenrostro and did not authorize this filing.  In mid-November, including on the date in question, Stokes had been hospitalized for spine surgery.

37.      Upon information and belief, Buenrostro, approximately 30 years old, has a history of impersonating others' identities, as well as using, creating, and/or selling fraudulent, illegal documents.  It has recently come to Stokes' attention that Buenrostro was prosecuted and/or convicted for possession or selling documents for the purpose of "selling false status" in Justice Court for Clark County, Nevada in November 2009.  Very shortly before that, also in November 2009, Buenrostro was prosecuted and/or convicted for two counts of possession of false identification, in the same jurisdiction.

38.      Stokes has discovered that on or near December 4, 2017, Buenrostro forged a fake email purporting to be from Stokes to himself (Buenrostro), in which Buenrostro, impersonating Stokes, says in the email, "Yes, we did take out, slush.  Needed that one.  I have been with the doctors all day. Come by soon."  The listed time of the email was 5:35pm.  This was entirely fake.  At the day and time that the email was purportedly sent, Stokes was traveling to Mexico.  Stokes has an airline ticket, ground transportation and itinerary, as well as credit card charges, documenting that fact.  Buenrostro could not have "Come by soon" as Stokes was outside the United States.

39.      Stokes could not have been "with the doctors all day," nor would he have invited

Buenrostro to "come by soon," as Stokes was out of the United States.  He was actively traveling at the time of the alleged email, and the IP address that sent the email, upon information and belief, will <u>not</u> show that it was sent from Mexico. Furthermore, he could not have been at doctor visits all day while on flights and ground transportation originating from Las Vegas at approximately 5:00 am.

40.    In reviewing emails that Buenrostro forwarded to Mr. Garelli, of purported conversations between Stokes and Buenrostro, Stokes realized that few, if any, of the emails that Buenrostro had forwarded to Mr. Garelli had actually occurred.  Stokes did not find them in his record of his "Outbox" or "Sent" file.  In printing and closely scrutinizing the emails, it is evident that some dates were manipulated or doctored, with warped numbers and letters.  For example, one entry appeared as: "September **07**, 2017 3:06 PM" The **"07"** was bold, while the rest of the date was in normal shading.   It appeared to be pasted in.  If viewed on a computer screen, the color of the screen behind the "07" appears white instead of grey like the rest of the space around it. Moreover, upon information and belief, Microsoft Outlook's dates rubric omits the zero before the date. The two emails sent by Buenrostro with "07" in the date are Microsoft Outlook emails, and thus should have been appeared as "September 7" instead of "September 07."

41.    In some of these forged emails, Stokes appears to have copied Buenrostro on emails to someone in Mr. Garelli's office, but that was not the case.  In other forged emails, Buenrostro and Stokes ostensibly discuss a "slush" fund (where Buenrostro secreted money he obtained by fraudulently negotiating Injury Loan's loans), but that was also not the case.  Stokes is not aware of any so-called "slush" fund, does not have a so-called slush fund, and has never authorized Buenrostro to open or operate a slush fund.

42.    Specifically, also, Buenrostro has misrepresented to third parties, that Stokes

always knew what Buenrostro was doing, and sanctioned it, including opening a joint bank account in his name.  This is also false.

43.　　Buenrostro has alleged that he personally traveled to Stokes' residence to "drop off checks" from his scheme, leaving them at Stokes' residence for him when the latter returned to Las Vegas from the hospital.  Not only is this false, but preliminary reports from Stokes' visitor log surveillance at his gate guarded residence demonstrates that Buenrostro did not visit Stokes' residence at the times that he says he did.

44.　　Buenrostro cannot identify the date, time and amount and place of each and every payment he allegedly made to Stokes from the loans Buenrostro sold.

45.　　Buenrostro cannot explain why the forged contract between he and Stokes apparently mirrors the formatting and layout, but with horrendous grammar, of another actual contract by and between Stokes and another attorney. This document was saved on the server Buenrostro's job gave him access to with Plaintiff.

46.　　Buenrostro would never be retained by Stokes to collect money or conduct business on the Plaintiffs' behalf because he lacks education and even a college degree.

47.　　Buenrostro would not have been retained to collect money for Plaintiffs when a licensed attorney had already been retained to collect money for Plaintiffs and at a lower contingency fee than mandated by Buenrostro's forged contract.

48.　　Buenrostro has attempted to demonstrate that he was an "independent contractor" which he ostensibly believes gave him authority to do these fraudulent transactions (which status would not grant him this authority in any case); but even still, he was not subject to a 1099, but a w-2, for an employee, not an independent contractor.

49.　　Buenrostro refused or neglected to disclose loan sales to Stokes, to the Injury Loans Bookkeeper and to the Internal Revenue Service when filing his tax returns for the

subject years.

50.     Buenrostro was not entitled to any proceeds or payments from any of the loans.

51.     Upon information and belief, Buenrostro has not reported this income, the proceeds he swindled from the Injury Loans, to the Internal Revenue Service (IRS).

52.     Buenrostro also forged emails (some of which are obviously doctored when printed out and viewed closely) ostensibly containing Stokes on "cc" lines, when Stokes never received these emails or notice of these emails.  Tellingly, Buenrostro used a "Gmail" address to communicate with third parties, instead of the company's email address, under the rubric, "injuryloans.com"

53.     It is believed that Buenrostro and Martinez benefited over $525,000 from his fraudulent scheme, but the potential legal and/or equitable value of the loans reasonably far exceeds this amount.

54.     From May 22, 2017 through July 1, 2017, just a few of the range of dates that Buenrostro purports to have met with Stokes, Stokes was in a medical facility in Texas, recovering from his cerebral aneurysm, and could not have met with Buenrostro.

55.     Prior to that, from May 2, 2017 to May 22, 2017, Stokes was incapacitated at University Medical Center (UMC) in critical care, without the ability to use either a telephone or computer (and in fact, had no access to either).

56.     Weeks before Stokes filed the initial Complaint in this case, Citibank sent a text alert to Stokes letting him know that Stokes' cell phone was added to the account. Despite having been notified of fraud by Buenrostro, Citibank still took inadequate steps to protect Stokes, and continued to allow Buenrostro to make changes to the account.

57.     Citibank sent Stokes a text message to inform him of a "change to his telephone" on a Citibank account that Buenrostro had set up.  Stokes, who did not authorize the

Citibank checking account in the first place, also did not authorize the change in telephone number.   Upon information and belief, Buenrostro added Stokes' actual telephone number to this account after discovering Stokes' investigation into the account. Buenrostro, upon information and belief, also added his personal cell phone number to the account.

58.      Buenrostro, upon information and belief, is a registered and/or licensed notary, and may have falsely notarized Stokes' forged signature on certain documents, to assist in his fraud, which was made easier by his having worked for Stokes and having become familiar with his handwriting.

59.      Stokes filed a police report against Buenrostro, which was initially joined by Mr. Garelli.   Upon information and belief, the Las Vegas Metropolitan Police Department (LVMPD) initiated a criminal investigation into Buenrostro, regarding which Stokes has volunteered substantial assistance.   Stokes has offered to provide a handwriting analysis to the LVMPD, and to allow them to access his personal emails and other documents.

60.      With respect to these injury loans, apparently, Buenrostro has misrepresented to third parties, including  the LVMPD, that he not only had authorization from Stokes to negotiate injury loans and accept proceeds, but that he also transferred a portion of the proceeds to Stokes while the latter was in the hospital.  This is demonstrably false.

61.      That at the time of Plaintiff closing the Injury Loans office, Stokes assisted Buenrostro in obtaining a new law office job with Naqvi Law Office because Stokes was concerned about Buenrostro not being able to pay his bills without any income as Stokes had no understanding that Buenrostro had already undertaken to rob his ill employer, Stokes.

62.      That Buenrostro admitted to stealing this money from Injury Loans after Stokes

discovered and confronted Buenrostro about the theft.

63.     That Buenrostro agreed to undertake a repayment plan to allow money to be returned to Preferred Capital for the loans sold by Buenrostro without consent and after he no longer worked for the Plaintiffs.

64.     That Buenrostro admitted he stole the money because he needed money to start a new business with his brother in buying and repairing motorcycles for resale to motorcycle riders.

65.     Upon information and belief, Buenrostro has caused to be filed against Stokes complaints with the State Bar of Nevada and Financial Institutions Division for State of Nevada as "pay back" for this Complaint and police report being filed against Buenrostro.

**III.     FIRST CLAIM FOR RELIEF--(CITIBANK: Negligence/Negligence *per se*)**

66.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

67.     As part of the duties that Citibank owed to the Plaintiffs was checking customer identification, and conducting a process whereby a third-party would not be linked to a bank account without its knowledge and consent. Furthermore, pursuant to the UCC, Citibank has many duties owing to a payee on negotiable instruments in which the bank accepts, including, but not limited to, a duty to not accept checks made payable to non-customers without properly identifying an endorsement from the payee.

68.     Citibank did not have anything on file that linked the S&S business account to Injury Loans.com LLC, and/or did not require Buenrostro to provide the plaintiffs' driver's license, passport, certified articles of incorporation, government-issued business license, partnership agreement, financial references, financial statement, or any other

information that would reasonably assure the bank that their customer's identity, and authorization to open an account on behalf of Injury Loans.com, LLC.

69.     Citibank failed to exercise due diligence in allowing S&S to open a bank account at Citibank with a fictitious firm name "Injury Loans" a full month prior to when Buenrostro filed the FFN with Clark County, Nevada.

70.     Citibank failed to exercise due diligence in taking steps to understand Buenrostro and S&S when the stated purpose to Citibank of S&S was to sell billboard advertisements when the FFN used appears to be a lending business.

71.     Citibank failed to conduct due diligence in accepting the transactions by Buenrostro, including, but not limited to, accepting checks made payable to Injury Loans.com, LLC, whether the instruments were endorsed by Buenrostro or any other party, or purported to be endorsed by any other party, including Stokes.  Conducting due diligence would have enabled Citibank to predict anomalies in the banking behavior of Buenrostro, which would have saved the plaintiffs harm.  Due diligence in verifying Buenrostro would have alerted the bank to the need to assign him a risk rating that would have determined a much greater amount of account monitoring and scrutiny.

72.     The Bank Secrecy Act ("BSA") is designed to deter money laundering by requiring a paper trail of cash transactions exceeding $10,000 and improving detection and investigation of criminal and terrorist activities.

73.     The BSA requires financial institutions to have a BSA compliance program that includes, at a minimum, written policies and procedures, currency transaction reporting and record keeping requirements for the cash purchase of monetary instruments between $3,000 and $10,000 inclusive.

74.     The BSA also requires reporting of suspicious activity, five-year record retention,

a designated BSA Compliance Officer, a Customer Identification Program (required under the USA Patriot Act), ongoing employee training programs, and an independent audit function implemented to test functions.

75.     The USA Patriot Act is a comprehensive anti-terrorism legislation that expands the responsibilities of United States financial institutions to prevent money laundering and terrorist activities.  All bank associates must comply with the USA Patriot Act.

76.     The BSA/Money Laundering Examination Manual issued by the Federal Financial Institutions Examination Counsel, revised in 2007, lists money laundering red flags.  Some of the red flags listed in the Examination Manual are customers who are reluctant to comply with reporting or record keeping requirements and wire transfers to/from a financial secrecy haven or a high-risk geographical location without an apparent business reason.

77.     A bank's identification of one or more of these red flags may require the bank to conduct necessary actions under the BSA.  The BSA requires banks to file Suspicious Activity Reports ("SAR") with respect to any transaction involving at least $5,000 which the bank suspects "involves funds derived from illegal activities."

78.     Citibank is required to "Know Your Customer."  That policy requires, among other things, that Citibank and its employees to understand the normal and expected transactions of the customer's business, to review activity that varies significantly from normal and expected activity, and document findings and report unusual or suspicious activity.  One of the types of criminal activity that may be hidden through money laundering is fraud.

79.     Certain customers are subject to special requirements to mitigate the risk of money laundering.  These types of customers require additional due diligence.  Among

those types of customers requiring such additional due diligence are Financial Institutions, including loan companies, such as the one that Sergio Buenrostro purported to be running.

80.     A customer's industry, or nature of business, should be used by Citibank to classify the customer with similar customers for risk and ranking, and monitoring and surveillance purposes, and provides basic information regarding the source of an industry's funds.  In order to perform an adequate risk assessment, Citibank's employees were required to understand the normal and expected transactions of a customer's business.

81.     Citibank associates, through interactions with customers and through completion of day-to-day job functions, are in a position to identify and refer unusual or potentially suspicious activity.  Each branch must have a process in place to report money laundering and related unusual or suspicious activity to the bank's global financial intelligence unit, and/or the money laundering reporting officer.

82.     Citibank's ethical requirements mandate that its employees participate in anti money-laundering efforts, and be able to recognize red flags and report potentially suspicious or unusual activities, as well as, make reasonable efforts to determine the true identities of all customers, and follow all "Know Your Customer" procedures.

83.     Due diligence on the part of Citibank required, among other things, collecting information about the customer for money laundering risk management throughout the life of the relationship of Citibank.

84.     Considering Buenrostro's activities and criminal history and considering his prior residential eviction, , it would have been a basic part of Citibank's due diligence to inquire as to the source of funds, purpose of the account, occupation, financial

statements, banking references, description of business operations, and other such information. All of this would have prevented or mitigated the fraud against the plaintiffs, and serve as an anti-money laundering preventive measure.

85.     Considering Citibank is a licensed lender in Nevada, it would have been a basic part of Citibank's due diligence to inquire as to Buenrostro's and S&S's and Defendant Martinez's lending licensing, source of funds, purpose of the account, occupation, financial statements, banking references, description of business operations, and other such information. All of this would have prevented or mitigated the fraud against the plaintiffs, and serve as an anti-money laundering preventive measure.

86.     The Patriot Act requires a bank to file a suspicious activity report if it suspects, or has reason to suspect, irregular activity. But not knowing their customers, Citibank failed in its duty, and such failure constituted negligence that caused the plaintiffs harm.

87.     All of the obligations alleged above was required under the bank's KYC rules, and specifically its CIP and CDD obligations, and the breach of which, constituted negligence, as well as the actions themselves (whether or not the bank was required to comply with the KYC/CIP/CDD).

88.     Citibank owed the plaintiffs a duty to act with reasonable care and to exercise the ordinary skill and ability commonly exercised by banking professionals. In failing to carry out even the most basic protections to avoid having a third-party implicated or harmed in a fraudulent banking scheme, breached that duty.

89.     The plaintiffs were harmed financially and reputationally when Buenrostro, with no oversight or challenge from Citibank, when Citibank accepted and deposited checks made payable to Injury Loans.com, LLC, Injury Loans, LLC, and/or Injury Loans, and provided those payable funds to S&S, Buenrostro and Martinez, and used the account to

secret and launder money that Buenrostro and Martinez had appropriated from Stokes' legitimate injury loans business, and/or attorney referrals.

90.     Citibank also owed plaintiffs a duty under the UCC, or NRS Chapter 104, including, but not limited to, NRS 104.3110, NRS 104.3202 and NRS 104.3306, to pay only the payee listed on the payee line of the check. Citibank breached that duty by paying a different payee than listed on the checks which harmed plaintiffs financially by depriving them of money properly payable to Plaintiffs.  As such, Citibank is not a holder in due course, and is subject to all claims against the instruments by Plaintiffs.

91.     Citibank, by way of its negligence, was the proximate cause of this harm, or Citibank's conduct was a substantial factor in causing harm to the plaintiffs.

92.     Furthermore, there was no negligence or any want of due care on the plaintiffs' part.

93.     As a direct and proximate result of the negligence of Citibank, plaintiffs have suffered financial loss, reputational loss, loss of Goodwill, and consequential damages, the exact amount of which, or a financial equivalent of which, will be proven at trial.

94.     The plaintiffs are entitled to attorneys' fees and costs, as well as interest, where appropriate, as a foreseeable consequence of Citibank's negligence.

**IV. SECOND CLAIM FOR RELIEF--(BUENROSTRO/MARTINEZ/S&S MARKETING: Fraud/Intentional Misrepresentation)**

95.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

96.     As described more particularly in the Factual Allegations (which are herein incorporated), Buenrostro has engaged in illicit, illegal, and unauthorized transactions that have put in jeopardy the reputation and Goodwill of Injury Loans (the corporate plaintiff), and the reputation and professional license of Stokes (the individual plaintiff),

as well as their financial well-being.

97.     Buenrostro has fraudulently forged Stokes' signatures on various documents, including a fraudulent contract and bank forms.  He has negotiated loans to which he had no authority to negotiate, and collected proceeds therefrom, to which he was not entitled.

98.     Buenrostro has acted in bad faith by promising to repay some of what he misappropriated, but then passing a bad check on the plaintiffs.

99.     Upon information and belief, Buenrostro conspired with a third party to collect proceeds that more properly belong to the plaintiffs, and secretly deposited them in the deceptive and secret Citibank account.

100.     Buenrostro has converted over $550,000 in Injury Loans funds, as well as Stokes' personal funds, and/or third parties' funds.

101.     Buenrosto misrepresented his authority to sell loans owned by Injury Loans.

102.     Buenrostro sold loans owned by Injury Loans using Buenrostro's personal cell phone number and personal gmail email address instead of utilizing Injury Loans proper phone number and @injuryloans.com email address.

103.     In so doing Buenrostro deceived third parties with harm to the plaintiffs, unilaterally changing dates, times, and documents, to falsely represent to third parties that Buenrostro was acting with authority from the plaintiffs.

104.     Buenrostro has deceptively manipulated email messages to appear as though they come from the plaintiffs when they do not, in order to facilitate his fraud against the plaintiffs and third parties.  Buenrostro has made several false representations that he knew was false.

105.     Buenrostro intended to induce third parties, including, by example, Mr. Garelli, to "purchase" loans of Injury Loans, concerning which Buenrostro had no authority to sell,

or negotiate profits or proceeds.

106.     Buenrostro further intended to induce another Company doing business as US Claims to purchase the same loans sold by Buenrostro to Preferred Capital.

107.     Buenrostro caused further harm upon the injured Injury Loans customers who then suddenly had liens for the same loans, now appearing as triple the loans, being asserted by three different companies against their personal injury cases (Injury Loans.com, LLC, Preferred Capital, US Claims).

108.     Buenrostro and Martinez had access to and used the monies from the S&S bank account at Citibank, which almost all of said monies were derived from fraud against Plaintiffs.

109.     Martizez either knew, or should have known that checks deposited to the S&S bank account were obtained through selling loans owned by Plaintiffs or other checks intended for Plaintiffs and that some of the loans were sold to more than one purchasing company, such as US Claims and Preferred Capital.

110.     Martinez was aware Buenrostro worked for Injury Loans and that Stokes owned Injury Loans. When Buenrostro added Martinez onto the S&S account, she knew Injury Loans was not Buenrostro's business. Martinez nonetheless used the business account to make over $50,000 personal purchases at stores like Christian Louboutin, Canyon Falls Hair Salon, Chanel, Haute Bride Salon, Louis Vuitton, Victoria's Secret, Ulta, Sephora and many others.

111.     Other parties justifiably relied upon Buenrostro's false representations, as described herein.  This has caused those parties, as well as the plaintiffs, to lose substantial assets, as well as reputation, and Goodwill.  In addition, the plaintiffs may owe obligations to third parties as a result of Buenrostro's and Martinez's fraud.

112.     The plaintiffs have thus sustained damages as a proximate cause of Buenrostro's and Martinez's fraud.

113.     The plaintiffs are not aware exactly how much money Buenrostro and Martinez embezzled, but as aforementioned, it is in the neighborhood of over $550,000.

114.     The plaintiffs are further damaged by having other lenders to whom Buenrostro sold loans, sometimes the same loans twice, making claims against the same personal injury case proceeds where Plaintiff Injury Loans had hoped to be paid for the loan it originated. There are now more hands seeking money from the same case settlement proceeds.

115.     The dates upon which Buenrostro and Martinez committed these acts are known to be *at least* within October 2016 to March 2018, but may have occurred on earlier or later dates, as well.

116.     As a result of Buenrostro's and Martinez' fraudulent activities, the plaintiffs continue to suffer damages, the exact amount to be determined at trial.

117.     As a further proximate result of Buenrostro's and Martinez' intentional misrepresentations, the plaintiffs are entitled to punitive damages in an amount to be proved at trial.

**V.     THIRD CLAIM FOR RELIEF--(BUENROSTRO/MARTINEZ: Civil RICO, 18 U.S.C. § 19 and NRS 207.470)**

118.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

119.     "Mail fraud" consists of the use of any fraudulent scheme to intentionally deprive another of property or legitimate services, and/or in furtherance of the scheme, relying in any way upon the United States mail, or making any false representations by means of the United States mail.

120.     "Wire fraud" consists of the use of any fraudulent scheme to intentionally deprive another of property or legitimate services, and/or in furtherance of the scheme, relying in any way upon telephone communications, electronic communications, or an interstate communications facility.

121.     The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. sections 1961-1968, is directed at "racketeering" activity, defined in section 1961(1) to encompass, *inter alia,* acts "indictable" under specific federal criminal provisions, including mail and wire fraud.

122.     18 U.S.C. section 1964(c) prohibits conducting or participating in the conduct of an enterprise "through a pattern of racketeering activity."  This section also provides for a civil right of action for any person injured in his or her business or property "by reason of a violation of section 1962," to recover *treble* damages.

123.     Buenrostro, in conjunction with Martinez, and a currently unknown third party, or third parties, and under the auspice of Injury Loans (without knowledge or authorization by its owner), and by way of his own, private enterprise, has engaged in a pattern of "racketeering activity."

124.     Buenrostro and Martinez, upon information and belief, used the United States mail, to send fraudulent documents, forms, fake contracts, copies of checks, and/or other materials to third parties in furtherance of the illegal and illicit scheme to defraud Stokes and Injury Loans.

125.     Buenrostro and Martinez used the telephone to communicate about, and electronic mail (email), to communicate about, and to send fraudulent documents, forms, fake contracts, copies of checks, and/or other materials to third parties in furtherance of his illegal and illicit scheme to defraud Stokes and Injury Loans.

126.     Buenrostro and Martinez has fraudulently obtained money and wired or deposited it into bank accounts controlled by them.  Buenrostro has collected monies from attorneys and/or other third parties with whom the plaintiffs have a relationship, where he was and/or is not authorized, defrauding both the plaintiffs, and the applicable innocent third parties.

127.     Buenrostro has also made false assertions to third parties by way of telephone, mail and email.

128.     Buenrostro and Martinez has fraudulently filed, or caused to be filed, false information to Citibank.

129.     Consequently, Buenrostro and Martinez violated a predicate racketeering act.

130.     The plaintiffs have suffered injury in their business and/or property by reason of Defendants' violation of the predicate racketeering act and/or acts.

131.     Buenrostro and Martinez's violations proximately caused the plaintiffs' injury.

132.     The plaintiffs did not participate in the racketeering violations.

133.     Therefore, the plaintiffs are entitled to damages under either the federal statute and/or state statute, and may recover up to three times actual damages sustained.

134.     Injury Loans and Stokes have been injured, as described above, by reason of Buenrostro and Martinez's violation of section 1962 and thus, may prosecute their claims against Buenrostro and Martinez pursuant to RICO for treble damages.

135.     Nevada law also provides for a civil rights of action for racketeering, with the predicate acts of wire and/or mail fraud, pursuant to Nevada Revised Statutes (NRS) 207.470.

136.     As described above, Buenrostro and Martinez have engaged in several illicit and illegal predicate acts or crimes related to racketeering as defined in NRS 207.360,

including embezzlement of money or property valued at $250.00 or more, obtaining possession of money or property valued at $250.00 or more by false pretenses, and/or taking property from another under circumstances not amounting to robbery.

137.     Buenrostro and Martinez have, with criminal intent, received proceeds from loan payments on personal injury cases from racketeering activity as set forth herein, and has used those proceeds for his own personal use in violation of NRS 207.400(1)(a).

138.     Further, though not necessary to this claim for racketeering, Buenrostro has made personal threats to Stokes and his wife, threatening their personal safety and well-being, as retaliation for their expressing to him their intention of pursuing this matter with the court, and law enforcement.

139.     As a direct and proximate result of Buenrostro and Martinez's wrongful actions, the plaintiffs have suffered and will continue to suffer damages, the exact amount to be determined at trial.

140.     Buenrostro and Martinez's wrongful actions were done with improper motives and with willful, wanton, or reckless disregard of the plaintiffs' rights, or were done oppressively, or with malice.  Injury Loans and Stokes are, therefore, entitled to punitive and treble damages.

141.     Plaintiffs have suffered additional damages in the form of attorney fees as a proximate and foreseeable result of Buenrostro and Martinez's wrongful conduct.

## VI.     FOURTH CLAIM FOR RELIEF--(BUENROSTRO/MARTINEZ/S&S MARKETING: Unjust Enrichment)

142.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

143.     Buenrostro and Martinez have absconded with the money and/or property of the plaintiffs in the Injury Loans practice, which rightly should have been turned over to the

plaintiffs. Buenrostro did this by negotiating directly with third parties to "sell" loans over which he had no authority, and pocketing the funds into a bank account that he and Martinez controlled for their own use.

144.     Buenrostro and Martinez were further unjustly enriched and caused further damage to Plaintiffs by selling the loans to third parties, sometimes the same loans to two different parties, for prices significantly lower than the amount actually owed to Injury Loans. So not only did Buenrostro sell the loans without authority, he marked down the price of these loans' values to pocket more money while selling them without authority for incredibly low prices.

145.     Buenrostro and Martinez have thus unjustly retained the money of the plaintiffs against fundamental principles of justice or equity or good conscience.

146.     Buenrostro and Martinez have thus caused damage by pocketing stolen money, by selling loans without permission for deflated prices and by causing additional lenders to make claims against injured customers' injury cases for the identical originally loaned amounts.

147.     Buenrostro has also, upon information and belief, appropriated funds to himself properly belonging to the plaintiffs and/or third parties to whom the plaintiffs may have a financial, moral, and/or legal obligation to compensate.

148.     Buenrostro has also retained other monies and/or properties that he should be required to disgorge.

149.     Buenrostro and Martinez should be required to disgorge the benefits they has received through Buenrostro's fraudulent negotiations (for which he had no authorization), as well as, forgery, and/or violating any and all laws, ethical obligations, and any and all agreements, in dealing with the plaintiffs, and/or other third parties to

whom the plaintiffs have an obligation.

150.     The value of the money and property unjustly retained by Buenrostro and Martinez will be determined at trial.

151.     In addition, the plaintiffs have suffered damages in the form of attorney fees as a proximate and foreseeable result of Buenrostro and Martinez's retention of the money and property of the plaintiffs.

**VII.     FIFTH   CLAIM   FOR   RELIEF--(BUENROSTRO/MARTINEZ:   Civil Conspiracy)**

152.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

153.     Civil conspiracy consists of defendants, acting in concert, intending to accomplish an unlawful objective for the purpose of harming plaintiffs, and plaintiffs sustain damage resulting from defendant's act or acts.

154.     Upon information and belief, Buenrostro, in concert with Martinez, and/or a third party, or third parties, accomplished the goals of defrauding the plaintiffs of proceeds or profits from the Injury Loans business, by negotiating directly with third parties, among other things, and secreting the funds in an account over which Buenrostro exercised partial control along with Martinez.

155.     Martinez along with Buenrostro drained the fraudulently obtained funds by spending the money at designer shops like Cartier, Chanel, Louis Vuitton, Christian Louboutin, Haute Bride Salon, MJ Christensen Diamonds and Yves Saint Laurent. Martinez knew this money did not belong to Buenrostro when she spent it.

156.     Although it is not fully known at the time of the drafting of this complaint the names of all third parties who assisted in this conspiracy with Buenrostro against the

plaintiffs, it is believed that such information will become available during discovery, and proved at trial.

157.     As a direct and proximate result of Buenrostro's and third parties' conspiracy, the plaintiffs have sustained damages in an amount to be determined at trial.

158.     As a further proximate result of Buenrostro's and third parties' conspiracy, the plaintiffs are entitled to punitive damages in an amount to be proved at trial.

**VIII.     SIXTH CLAIM FOR RELIEF--(ALL DEFENDANTS: Injunctive Relief)**

159.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

160.     Buenrostro must cease negotiating with any third parties with respect to Injury Loans and/or Stokes.

161.     Buenrostro must cease collecting any proceeds concerning any clients of Injury Loans and/or Stokes.

162.     Buenrostro must cease operation of any bank account to which he has affixed Stokes' and/or Injury Loans' name or approval, and immediately void any and all transactions with any third parties for which he is neither authorized, qualified, licensed, nor approved.

163.     Buenrostro must disburse the funds he has in his possession that he has illicitly gained from the plaintiffs, including, but not limited to, proceeds or profits from Injury Loans.

164.     Buenrostro must immediately cease using the business name "Injury Loans" or the individual plaintiff's name, "Adam Stokes" in any way.

165.     Buenrostro must immediately close, and/or cease opening lines of credit, or

obtaining credit cards, using the plaintiffs' name or association.

166.     Buenrostro must stop defaming or putting into a false light the plaintiffs, by telling third parties that his illicit and illegal actions were sanctioned or approved in any way by the plaintiffs, and/or holding himself out to be in association with the plaintiffs, and/or making threats of any kind to the plaintiffs (which he has on occasion already done to the plaintiffs in connection with this matter).

167.     Buenrostro must provide to Plaintiffs proof that Buenrostro deleted from his records all business records belonging to Injury Loans or to Plaintiff or to any business created or operated by Stokes.

168.     Citibank must immediately cease allowing Buenrostro and Martinez to operate an account with Stokes and/or Injury Loans as signers, joint owners, or concerning them in any way.

169.     Citibank must immediately cease allowing Buenrostro and Martinez to withdraw and/or control any funds on accounts that have Stokes and/or Injury Loans as signers, joint owners, or concerning them in any way.

170.     Citibank must immediately cease allowing Buenrostro and Martinez to make any changes of any kind to any and all bank accounts (including change of telephone number) associated in any way with Stokes and/or Injury Loans.

**IX. SEVENTH CLAIM FOR RELIEF--(ALL DEFENDANTS: Declaratory Relief)**

171.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

172.     Plaintiffs are not bound by any fraudulent agreement that they neither drafted, discussed, nor signed with Buenrostro.  The court should declare invalid any fictitiously

created documents with forgeries of Stokes' signatures by Buenrostro.

173.     Plaintiffs are not bound by any fraudulent bank account that they neither opened, nor authorized, nor approved, nor signed.  The court should declare invalid any fictitious banking documents and/or checks with forgeries of Stokes' signatures by Buenrostro.

174.     That the sales of loans made to Preferred Capital and US Claims or any other party by Buenrostro are void.

175.     That Defendants Buenrostro and Martinez should provide to the Plaintiffs all items purchased with money from the Citibank account so Plaintiffs may sell such assets in an effort to partially recover theft losses.

## X. EIGHTH CLAIM FOR RELIEF--(ALL DEFENDANTS: Conversion)

176.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein. The acts constituting conversion as it related to Buentrostro and Martinez is set forth in the foregoing paragraphs as though they were fully set forth herein

177.     Additionally, Plaintiffs owned, held an interest in, or had the right to possess, including, but not limited to, checks numbered 008236, 008237, 4670, 008600, 008768, 09430 and 5196;

178.     Buenrostro intercepted these checks, among others, from the Plaintiffs' mail box;

179.     Buenrostro forged or without authority placed an endorsement on the checks he took from the Plaintiffs;

180.     Citibank, a financial institution, negotiated, including, but not limited to, checks numbered 008236, 008237, 4670, 008600, 008768, 009430 and 5196 without Plaintiff's authorization.

181.     Pursuant to NRS 104.3420, Citibank committed a distinct act of dominion wrongfully exerted over plaintiffs' property by depositing the checks made payable to plaintiffs into the account of an another.

182.     Defendants' actions were done in defiance of plaintiff's right to the property.

183.     As a direct and proximate result of Defendants' actions, plaintiffs have sustained damages in the amount of the face value of the subject checks and additionally in an amount to be determined at trial.

184.     As a further proximate result of Defendants' actions plaintiffs are entitled to punitive damages in an amount to be proved at trial.

**XI. NINTH CLAIM FOR RELIEF--(CITIBANK: Violations of UCC)**

185.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

186.     Plaintiffs were the rightful owners and payees of checks deposited into the Citibank account for S&S.

187.     Citibank violated the provisions of NRS Chapter 104, including but not limited to NRS 104.3110, NRS 104.3202, NRS 104.3305 and NRS 104.3306 by accepting checks made payable to Plaintiffs, and allowing Buenrostro to deposit checks belonging to Plaintiffs.

188.     Furthermore, Citibank is not a holder in due course, and is subject to all claims on the checks accepted by Citibank which were payable to Plaintiffs.

189.     As a direct and proximate result of Citibank's violations of the UCC and NRS Chapter 104, Plaintiffs have sustained damages in an amount to be determined at trial.

## XII. TENTH CLAIM FOR RELIEF--(CITIBANK: Monies Had and Received)

190.     Plaintiffs repeat and reallege the allegations contained in the foregoing paragraphs as though they were fully set forth herein.

191.     Citibank accepted for deposit checks from Buenrostro with forged endorsements.

192.     Citibank acquired no title to these checks by virtue of the forged endorsements.

193.     Citibank collected the proceeds from these checks from the drawee bank.

194.     Plaintiffs are entitled, in equity, to recover from Citibank as for money had and received the proceeds collected by Citibank from the drawee bank.

195.     As a direct and proximate result of Citibank's actions, plaintiffs have sustained damages in the amount of the face value of the subject checks and additionally in an amount to be determined at trial.

196.     As a further proximate result of Citibank's actions plaintiffs are entitled to punitive damages in an amount to be proved at trial.

**WHEREFORE**, plaintiffs, and each of them, pray for the following relief:

1. Compensatory and consequential damages;
2. Equitable relief,
2. Attorneys' fees and costs of suit;
3. For punitive damages;
4. For declaratory and injunctive relief;
5. For prejudgment and post-judgment interest as provided by law;
6. Jury trial, if need be, on all issues against any and all defendants;
7. For any other relief that the court deems appropriate.

Dated this 29th day of April, 2020.


__/s/ Karl Andersen_____
Karl Andersen
5550 Painted Mirage Rd., Suite 320
Las Vegas, Nevada 89149
*Attorneys for Plaintiffs*